The last case this morning is 4110527, Standard Mutual Insurance Company v. Lay and Locklear Electric. Show appearance of, for the appellant, Michael T. Reagan. You are he, sir? I am. And for appellee, Robert Mark Chemers. If I pronounce that correctly? Yes, you did. Okay. Mr. Reagan, you may proceed, sir. Thank you. Good morning. May it please the court. Good morning, counsel. My name is Mike Reagan, and together with David Oppenheim, who is seated at the council table with me, I represent the defendant, appellant, Locklear Electric, Inc., who is the class representative of the certified class in the underlying federal court action. I'd like to spend just an extraordinarily few moments on the fact that this is a de novo review. Now, the panel is fully familiar with the fact that on the appeal from summary judgment, that no deference is due to the decision of the circuit court judge. But in most cases, I think that both the reviewing court and the circuit council will sneak a look at what the circuit court did to have some understanding, and obviously the court's work is entitled to respect. But here, there isn't the slightest indication anywhere, in either a transcript or in an order, as to what might have been on the judge's mind. So they lost the coin toss? Is that what you're suggesting? I would never say that. But I think I'd like to emphasize that we're starting here with a truly fresh slate. I don't intend to try to restate the briefs here. The issues in this case lend themselves to briefs. The briefs are well done on both sides. I'd like to touch upon a few points which I think might be key to getting a flavor of this case. First, and if it's the only thing I can accomplish today, I'd like to take on both the aura of collusiveness that standard mutual has. Excuse me, the aura of what? Collusiveness. I guess I invented the word. Which they attempt to paint in their brief, and also its legal claim, standard mutual's legal claim, that it need not indemnify its insured lay because lay did not obtain permission for settlement. And so the whole thrust of the latter third of their brief is there's something wrong with this settlement. But there's no substance. And so once you get past the adjectives, there's really nothing unusual nor wrong about the way in which this case was settled. It's both normal and necessary when you have a case in which the insurer does not participate in the defense and does not express any interest in participating in the settlement. Standard mutual conceded from the outset that it had a conflict and that it couldn't control the defense, even though it did proceed with appointed counsel for a while. And it doesn't now contend otherwise. And it concedes that it had to give up control of the defense because of conflicts of interest, although they did not set out all of it. And so it's obvious, as I thought about it, at least obvious to me,  And if that weren't so... You know, in most insurance cases, the reason the insurance company has to let the insured have their own lawyer is there's two theories of liability, one of which is covered by the policy and the other which is not. And the concern is the insurance company is going to force the judgment into the non-covered area. Well, here we have just the opposite. We have the insured with his own attorney, and isn't there a concern that the insured is going to force the settlement into the covered option as opposed to the non-covered option? Well, the insured has to... Somebody's got to settle the case. I mean, if the case never settles, or if it's not tried... Does the insured have any obligation to protect the insurance company? He must act reasonably. So the standard, which I will document here in a second, which we haven't agreed, the standard is acting as a reasonable uninsured is the word that shows up in the cases. So that's the standard. He has to act reasonably. He certainly has the right to act in his own interest. We know that the insurer is not going to and has said, we don't believe there's any coverage. And so there would be an outer bound, Justice Cook, there would be some limit at which a settlement would not be approved. But if it's reasonable, and that's the language of the cases, and it is here, and we've offered examples of many instances in which the courts have approved these settlements. So as a jurisdictional matter, there cannot be a determination of the duty to indemnify until there's been a conclusion of the underlying case. And so the courts recognize that the insured has the right to make those decisions about settlement, and he would be put in an untenable position if the rule did not permit the insured to make a reasonable settlement. So in ComEd versus National Union, First District 2001, the court elaborated on what those untenable positions would be. First of all, if faced with no coverage if it's settled, the defendant would always have to vigorously defend every case until it's in. And we've cited in the brief cases which say the law favors settlement, favors settlement in particular in class actions. Secondly, ComEd says that the insured would be in the difficult position of first refuting its liability in the trial of the underlying case, and then having to turn right around and establish its liability in order to succeed in the coverage action. So I'm not telling you that the situation which everyone was confronted with here was easy, but nonetheless, it's not uncommon, and there are contours and guidelines which have been set out in the case law. And ultimately, of course, the decision about whether to settle, how to settle, dwarfs the mere control of the defense itself. I mean, that becomes secondary, only leading up to what do we do with it. MIOTA, the First District opinion, 2009, is functionally the same in this case. The insurer said, yeah, we recognize we have a duty to defend. You have the right to pick your own counsel. We'll pay for them. And the court said that surrendering the defense to independent counsel meant that the insurer no longer had control over, quote, the course of the litigation, and they approved the settlement. We talked about ComEd and how they approved the settlement there in very similar circumstances and talked about and examined why the rules simply couldn't be otherwise. Counsel, one of the advantages of oral argument is it gives counsel an opportunity to address specific matters that the court's concerned about. Please. I'm concerned about punitive damages in this case, and I'd like you to address that in the context that I think it's every so often helpful for courts to view things in a real-world perspective. I have, as I'm sure everyone has, received faxes that I didn't want. I'm a victim, potential litigant under the TCPA, I guess. And so I'm trying to figure out what's the cost to me of getting a fax I didn't want. Well, a sheet of paper, some ink, my time of glancing at it. Which is extraordinarily valuable. Yes, of course. But how does it add up to 500 bucks a pop? And if by no stretch can it be viewed as compensatory for what I'm out, why isn't this a penal statute and punitive damages which are not insurable in the state of Illinois? Okay. I'll take on the question. Thank you for asking it. And you've also touched on what the rule for decision here is, because they don't have a policy provision saying we're not going to pay these nor punitive damages. They have to be tied only to what you just talked about, which is public policy. Well, I suppose my first question is, isn't it correct that in Illinois law punitive damages are not insurable? Generally speaking, there are a number of exceptions to it, but we don't tie to any of those exceptions in this case except to say that this is not. Okay. So that's the question. Leaving aside then any claim of exceptions, the question is, are they punitive damages or not? And they're not. And so we know what the congressional intent was. And the intent of the Congress, there's a lot of legislative history on this. It's cited in many of the cases, set out in many of the cases. And they wanted to protect fax machine owners, and they knew that this was a very aggravating problem. $500 is in excess of what you suffered when you received the case. But that doesn't mean that it can't be regarded as liquidated damages, which is what much of the case law is. And I'll talk about the majority rule at this point in just a second. The remedy here flows to the individual plaintiffs and not to the government, and that's not controlling on the question of whether or not it's penal or remedial, but it is a factor to be looked at. It's also intended to provide incentives to private parties to act as private attorneys general, and that's a factor recognized in the cases. And I probably can't do better than Justice Jorgensen did in her appellate opinion in Italian Foods versus Suntours, vacated, I know, by the Supreme Court. But what I want to tie to is the research which she set out on behalf of her colleagues on the panel. And she said that on a national basis, the majority of cases hold that this is a remedial statute and not one that is a punitive. So even though Italian Foods has been vacated by the Supreme Court because the court said they shouldn't. Well, head counts are always interesting, but I'm interested in the discussion on is this compensatory? It appears not to be. And if it isn't, then how is it not punitive? Well, when you say it's not compensatory, with respect, I can't agree with that. Because it is not compensatory. It's not making me whole for the tort committed against me. That's compensatory damages. I mean, if you drive a car and you run into somebody and you've suffered physical injuries and you've suffered certain damages to your car, the idea of tort law is to make you whole for the injuries you've suffered. And in fact, if I've suffered no physical injuries at all, then they're just going to fix my car. Isn't that right? I'm sorry. Yes, that's right. However, what Congress was also recognizing was the intrusion upon the right of privacy, which the Congress established in the TCPA. And you can't put a number on that as clearly as you can the paper that's on your board fixing your car. Congress has the right to decide that $500 is appropriate. How about $5,000? I mean, is that it? Or just any figure Congress chooses that answers the question? I guess certainly this Court would wish to give some deference to what Congress had to say about that. Actually, we have no obligation whatsoever, Counsel. It seems to me that on the question of whether the $500 is punitive or whether it's compensatory is an issue that Congress didn't concern itself with nor need it have. It's a matter of Illinois law because in the states where, for instance, you can insure punitive damages, it would be no issue. There is an additional aspect to the statute which I think informs, helps me answer your question, and that is that there is yet another remedy provided by the Congress, another provision provided by the Congress, which is for willful conduct. I may say wanton also, but certainly willful. Then the Court is permitted to award treble damages. Now, we don't have the case before you here today as to whether those treble damages constitute punitive damages or not. But if you were to look for anything in the statute as being punitive, perhaps that might be. And it fits into the niche of other statutes in which Congress set out to punish conduct by awarding treble damages. And so there could be that punitive aspect to the case or to the statute. But, again, that question isn't here. There were rights that were violated, rights established by the TCPA and rights that are difficult to assign a number to. And the opinions which are cited in Italian FOOS and quoted at some length talk about how it's just very difficult. Let me be more explicit. You said this isn't punitive. I'm trying to come up with simple bright lines here. It seems to me damages are either compensatory or they're punitive, one or the other. I don't know of any third. And if this is supposed to be compensatory, I want you to explain to me how $500 can possibly be an appropriate figure to compensate me for getting a fax I didn't want. With respect, Your Honor, I think that the dichotomy here is not between compensatory damages and punitive, but rather between a punitive statute and a remedial statute. And that's the dialogue. And so you don't find, again, with respect, because the last thing I want to do this morning in Springfield is to be pushing you too hard at some point. But nonetheless, I think that with respect that the way the cases and statutes are split is between penal and remedial. And is there something for which the legislature, be it state or federal, wants to afford a remedy in order to achieve an end set out by the legislature? And if so, then it's remedial, separate and apart from whether it is looked at purely as compensatory damages. So that's... Why wouldn't the Illinois policy against insuring punitive damages apply here? That is, something the policy is, we don't want to permit insuring wrongdoers who are subject to punitive damage provisions. We want punitive damages, since they're not compensatory by definition, to be paid by the tortfeasor himself. Why wouldn't that policy apply in a situation where you have $500 assessments for faxes? And to say to people, by the way, if you're going to violate the TCPA, don't be looking for insurance coverages to bail you out. Because the conduct which gives rise to the liability under the statute is not such reprehensible conduct as would fit typically within the types of things for which you cannot get insurance coverage. And you can have... It's a strict liability statute. You don't necessarily have to knowingly violate it in order to be found liable under it. And I think it would be a harsh world indeed if the court were to say, if this court were to say, in the face of the head count which says otherwise, that a person could not insure themselves against that. And so there's lots of conduct that you're not supposed to engage in which you are permitted to insure yourself against. And it is only the outer bound of bad conduct, just terrible stuff, which gives rise to something that you can't insure. And so it does not offend me. I mean, there's... The law... Any aspect of computative damages, court law, et cetera, is the court fees or the defendant did something wrong and you don't want them to do it again, but that doesn't mean that in all instances you can't insure against it. And so I think it comes back to the beginning, which is Congress looked at this problem and they wanted to... The public was crying for a remedy. They needed something to happen. And Congress made this decision about this is the remedy we need. They could look at it and say, like you, that I'm not terribly offended by the loss of my toner, the loss of a little bit of my phone line, et cetera. And if that's all that they were going to make a remedy for, then that's not much of a remedy. So in the context of trying to craft an effective remedy, which would take care of the plaintiffs in the case, the people who were wrong, I think that the $500 is a good balance. And it's not shocking. I mean, we might be here with a different case if it were $5,000. But again, I come back to I think the very reasoned explanation that Justice Gorganson gave in outlining the case. I'm not pointing to one other co-equal, compatriot of yours in a vacated opinion and saying that's the rule. But I do rely upon the very thorough research that she set out there. So my time is essentially done. I've got a few minutes, though, if you want. Well, I have nothing else to add to you on that question. I suppose I guess I'd like to say this one other thing. For many of their arguments, and with great respect to my friend, what he wants us all to do is to get into a wayback machine and go back to the golden days, in his view, of the Seventh Circuit's opinion in American states. Because many of their arguments go back to the reasoning set out in American states. In Valley Forge versus Swiderski, the only Supreme Court not only disagreed with it, but rejected the reasoning. And so to the extent that many of their arguments are grounded upon Valley Forge, then I think that they have to be discounted to that extent. Okay. Thank you, Counsel. Mr. Chemers. Good morning, Your Honors. May it please the Court. Counsel. Counsel for the plaintiff, Appellee Standard Mutual Insurance Company, Robert Chemers. Justice Steigman, I think you hit it on the head. You cannot possibly justify, in the context of insurance, paying $500 for the receipt of a fax. It is not compensatory damage. It is clearly penal. It is punitive in nature. It is designed as retribution and a deterrent. That's the essence of the TCPA, is retribution and a deterrent. from doing the blast faxing such as they claim was done here by this fax found at C543 of the record, which was sent to fax machines apparently with 217 or 618 area codes about the sale of a car wash, which fax was sent, by the way, from Bucharest, Romania. It says right on it. Bucharest. Bucharest. This message is the property of Macaw, SRL 46, Match Factory Street, Section 5, BUC, which is the abbreviation for Bucharest, Romania, and their European equivalent of a zip code. That's what happens in these cases. We cited a lot of these cases. They cited more because they've been involved in many of them. You can look at the purpose of the TCPA. That's one thing. Then you have to look at Illinois law and Illinois law with respect to insurance. Mr. Reagan talked about the right of privacy. What court in Illinois has held that a corporation has a right of privacy? Justice Easterbrook in the American States case from the Seventh Circuit said, where does a corporation go when it wants to be left alone? We know there are two rights of privacy, seclusion and secrecy. Well, publication of an unwanted advertisement has nothing to do with secrecy. It deals with seclusion. Well, it's the right not to be bothered maybe is a better way to put it. That's seclusion. That's the seclusion interest, not the secrecy interest. And does a corporation have a right not to be bothered? What about Mr. Reagan's argument that when you're talking about punitive damages and deterrence, you're really thinking about more of outrageous conduct, things that would strike somebody as being exceptionally bad that you want to stop, and that those are the kinds of things that the idea about not ensuring punitive damage awards address. And if you have a statute that is designed as a deterrent and to instill retribution in the form of $500 per fax, then you have to ensure that conduct would allow someone to send faxes with impunity or immunity because at the end of the day they seem to think an insurer is going to pick up the tab. And that's not necessarily true. The damages under the TCPA are clearly penal in nature. Justice Jorgensen in Italian Food, she was quoted earlier by Mr. Reagan, that's a vacated decision. That's probably on par with the Rule 23 order. Well, but nonetheless, I mean, and I'm glad he mentioned it because I know Justice Jorgensen, a very sharp person, and where did she go wrong in her analysis? It's vacated or not, it has persuasive value if we are so persuaded. So tell us why we shouldn't. Well, I looked at it and said that was her view of it. The Supreme Court disagreed. They vacated. Well, maybe they disagreed. It wasn't really directly on point. You can't exactly tell other than the decision is gone. So tell me about her underlying analysis on apparently this is not punitive damages. Where was she wrong in that analysis? Those were questions in connection with the nature of the statute, not with respect to insurance. The essence of insurance is to provide a wherewithal for damages. And the damages have to be in the nature of compensation. How is $500 for a fax compensation and not penal in nature? The cost of the paper, the toner, the ink, the use of the phone line, the momentary nanosecond loss of use of the fax machine has to be worth pennies. But the Congress isn't going to have a statute where it says $5 per fax. They're not going to have one where it says $50 per fax. So they put a number that has teeth in it, which is in the nature of a penal amount, $500 per fax. You heard me raise the question to Mr. Reagan, and he didn't quite buy it. Namely, are all damages either compensatory or penal? Yes. So there's no third category. No. The damages are either designed as compensation, which is regular compensatory damage, compensate you for your loss, or they're penal. They're designed to punish or they're part of retribution. So a liquidated damage is merely an agreement between the parties to, in the event of a problem arising, to avoid having to go to the bother of figuring out what the compensation is? That would be my view of a liquidated damage. But it's still compensatory damages, not penal damages, even in a liquidated damage context. Yes, I would agree with that. Let me ask you, in the event of an automobile accident, the jury comes back with a huge verdict, much more than anybody ever would have thought. Is that punitive damages? No. The jury verdict is going to be, well, is it based on the evidence? Is there a reasonable basis on the evidence to award that amount of damage? If there isn't, then on an appeal, it could be reversed, perhaps. Contrary to the manifest way of the evidence, it's contrary to the instructions given, it's contrary to the evidence. But even though the insurance company thought the damages were excessive, the insurance company still has to pay them. If it's affirmed, yes. Or if there's no appeal, yeah. Would you agree that the – I guess we're going to talk about Judge Jorgensen this morning more than we talked about anything else. The weight of the – the direction of the law appears to be, or the weight of the law appears to be in the direction of saying a statute like this is remedial. This statute is remedial. Well, that was her view. That was her – There are cases from other states. Right, that's what I meant. This court can utilize the work that went into that already vacated decision if it wants to reach its own decision. But compensatory or punitive, there are other issues in this case, significant issues in this case. In fact, they haven't cited one case remotely similar to this case. This is a case where an insurance company, through a very lengthy and detailed reservation of rights, provided a defense to its insurer, laid out the conflict. The conflict was waived by a signed waiver from Norma Lay and her husband Ted Lay. And they were given counsel by Standard Mutual for defense. Then a month or two into that defense, another attorney says to defense counsel hired by Standard Mutual, you're in a conflict and he's pushed aside. And this other attorney takes over. The insured then enters into the consent judgment, the rollover agreement with Locklear for $1,739,000 and wants Standard Mutual to pay for it. Now, I said there's no case like this in Illinois. The Supreme Court in the Guillaume v. Potomac case said this type of settlement is okay. An insured can determine a number, agree with the plaintiff, rollover, have a consent judgment, and give an assignment of its rights against the insurance company where the carrier abandoned the insured. That's the essence of Guillaume. Here, Standard Mutual didn't abandon its insured. It got fired by its insured. Justice Cook, you asked a question about can an insured force a settlement. Well, every contract in Illinois has in it, implied as a matter of law, a duty of good faith and fair dealing. It's a two-way street. The carrier owes duties and obligations to its insured, and the insured owes them as well. Otherwise, you're going to have a situation where you have an auto accident. It's a rear-ender, dead-bang liability case. The insured decides, I'm not going to go to trial. I've got a vacation, so I'm not going to appear. They don't need me there because it's liability. So the carrier is going to take the position. It was prejudice that there's an adverse verdict. It's not up to the insured to go to the plaintiff and, in effect, cut a deal and ask the carrier to pay for it. Gwilin says you can't do that. Gwilin says you can do that. The insured can do that where there was an abandonment by the carrier. We don't have that here. Miyota Computer, that Mr. Reagan said, is not the same case. There was no offer of a reservation of rights with a waiver of disclosed conflicts by the insured. Now, the conflict they complain about was raised. The reservation of rights letter refers to, in its 12 pages of length, that in connection with the foregoing, is based on our position that the class action complaint seeks damages which are in the nature of a penalty or, alternatively, treble damages in the event it is established that statutory violations were willful. See 1113 of the record. That's the next to the last page of the reservation of rights. This court, in an opinion by Justice Cook, just from last December, American Family v. Westfield, discussed at length the nature of reservations of rights and said a proper reservation of rights is one that adequately explains the policy defense, refers to the policy and states the defense. An improper or insufficient reservation of rights is one that has no discussion of the policy. Let me ask you something that's a little bit different here. It's about the law that should be applied in this case. Now, the district court found that the insured did not act intentionally. So what if we had the situation where the case went to trial, the insured testified he didn't act intentionally, and the verdict came down not just against the insurance company but against the insured. Shouldn't an insured be allowed to insure against something like that? I know that's not this situation. Well, insurance companies provide defenses subject to reservations all the time. And there are two aspects of the duties an insurance company owes. As this court knows, duty to defend, duty to indemnify. We haven't even talked about the duty to defend here. If we're talking about the duty to indemnify, there is no duty to indemnify if there is no duty to defend. So if this court finds that a corporation has no rights to a seclusion right contrary to their position, then there's no duty to indemnify. If this court finds the damages under the TCPA are penal, then there is no duty to defend. There is no duty to indemnify. It is not unusual for cases to go to trial subject to reservations of rights with then adverse verdicts being entered, and it's up to the insured to either pay it or to bring a declaratory judgment action on its duty to indemnify it. Because the bond's already burned down, so there's no reason to discuss the defense obligation. Here, the settlement agreement... I mean, we're saying, oh, this is so horrible to allow an insured to buy insurance that covers punitive damages. And I'm saying you could have a situation here where the insured doesn't know that this is a problem. This is an innocent mistake, and all of a sudden you have a lawsuit, and it's not a lawsuit that dumps everything on the insurance company. It's a lawsuit that results in a liability for the insured. Why can't the insured get coverage for something that was an innocent mistake? Well, an innocent mistake is negligence, and you buy insurance for that all the time. That's what insurance covers, a fortuitous loss. Sending blast faxes, as I said, it's a strict liability statute, unless it was done willfully and intentionally, then it carries treble damages. It takes any stretch of the imagination to say treble damages are not compensatory. Treble damages are in the nature of punitive damages. And here, Norma Leigh, who signed this agreement with Bockler, was never legally obligated to pay damages. I think the court needs to focus on the insurance. We're talking about insurance coverage here, and the policy. There are three of them here. The policy says that the carrier is legally obligated to pay... Whatever sums the insured is legally obligated to pay as damages. Legally obligated to pay as damages. Norma Leigh was legally obligated to pay nothing. She had no obligation to pay damages, no insurable loss, no right to indemnification, no financial risk, no obligation to pay whether there was coverage or not. And in fact, she agreed to serve up her employees to assist. And what did one employee do? One employee signs an affidavit, not in this case, in the federal case, where she said in her affidavit, I overheard a dead man talk to somebody on the phone, and he was told that these are people that you can send taxes to. That's the Biven affidavit. But we didn't have a chance to deal with that Biven affidavit. We weren't given notice. You can't find any notice of a settlement, of a hearing, not to Standard Mutual. Standard Mutual didn't participate in the settlement. The entire premise of billing from our Supreme Court is the insurer abandoned the insured. That's not this case. This case is not Pekin v. X data from the First District. This is not my old computer. This is a different case. The Supreme Court also said the essence of allowing the insured to enter that type of agreement, where you look at the language, legally obligated to pay as damages, you say, well, if the carrier abandoned the insured,  which is according to then Chief Justice McMurrow, is the argument fails. The carrier shouldn't be allowed to rely on anything in the policy that would support it where it walks from its insured. It abandoned the insured. That's not this case. But the Supreme Court went one step further. They were concerned that this type of settlement has the possibility of collusion. And they said that at 203 Illinois 2nd, 163, the end goal is to create an agreement so that the insurer, a non-party, pays. The plaintiff must prove that the settlement was reasonable before the carrier can be asked to pay a nickel. That wasn't done here. That's part of the reason why the court granted Standard Mutual's motion for summary judgment and denied theirs. The test, according to the Grillen Supreme Court, is what a reasonably prudent person in the position of the insured would have settled for on the merits of the plaintiff's claim. But I have to ask, is that a reasonably prudent person using his own money or a reasonably prudent person who doesn't care? Because at the end of the day, they have no exposure, no obligation, because if there's no insurance coverage, or even if there isn't, if there's no insurance coverage, they still pay nothing. The settlement agreement is referred to throughout the briefs. It is set forth in the record. And it is unmistakably clear that the party who is supposedly liable for the last faxing of some 3,400 faxes walks away, so that the purpose of the TCPA arguably has not been served, coupled with the fact the only fax we know of that was ever received is C-543 of the record, which was arguably sent to Locklear, because they didn't establish to the district court, other than they said there's 3,478 faxes were sent, there is nothing in the submission that they have in this record from the district court as to how many faxes were received. You're referring to the district court. Correct, the trial court, in East St. Louis, the federal district, with respect to the settlement. The TCPA has nothing to do with sending faxes. Its purpose is to deter sending faxes which are received. If the fax isn't received, who cares? Now, we all know about telemarketers, which is the other part of the TCPA, because probably everyone was sitting in their home at one point within the last week and got a call, 6, 630, Mitt Romney, or somebody else, or some machine, that actually said, sorry we missed you, we're going to call again later. Have you ever gotten a return call from a machine? I'm sure we all got those calls. The issues in this case are such that if the court is of the mind that the damages are punitive, no duty to defend. If the court looks at these policies and realizes that two of these policies are with respect to, one, a four-unit apartment building in Girard, Illinois, the other with respect to two vacant lots in Girard and Nilewood, Illinois. I said Nilewood, it's Nilewood, and if I said Nilewood, I know it's Nilewood, but I'm not sure. It's either in Sangamon or in Macoupin County. Those policies clearly have nothing to do with this. They have nothing to do with the business. No duty to defend. If there's no duty to defend, there's no duty to indemnify. The court says, wait a minute, even if a corporation has rights, we buy into what the first district said in X data, even though we're not bound by it. Corporation has rights, okay, then we go to indemnity. This rollover agreement, we submit to the court, does not pass muster under the Supreme Court decision in Gwilin. What this court will have to do to embrace this type of a settlement agreement is basically to say, look out, insurance industry, if you're defending under a reservation and a good deal comes along, the insured is going to take it. You will be stuck. That's what they're saying here is the result of this. That's not what Gwilin said. Gwilin said it made its holding on the sole premise that the carrier abandoned the insured. The carrier had whatever it had coming, it got it. But it also said the carrier could attack the reasonableness of the settlement. The Supreme Court made that very clear, and that has not been done here. So for all these reasons, we would ask this court, affirm the judgment. If the court in any way is going to reverse, then reverse solely for a hearing on reasonableness as an absolute last resort, because we think the judgment was eminently correct and should be affirmed. Thank you, counsel. Mr. Regan. Thank you. What he just told you about remanding for a hearing on reasonableness, it's the first time it's been mentioned. They have not asked for that in the brief. They didn't ask for it below. It's new to the court this morning. Secondly, touching again on something he just said, he said that two of the policies were issued with respect to premises in particular locations, but there is nothing in either of those insurance policies tying the potential liability of the insurer to activities of those premises. There are lots of cases in which the insurance company can put in those provisions, but they didn't here, and so that argument has nothing to do with this. Justice Steinman, with respect to the question of what is the proper dichotomy here, is it compensatory versus remedial, or is it remedial versus punitive, the closest I can come up to without firing up the computer here is a quote from Scott versus Association for Childbirth from the Supreme Court in 1981, and if you just bear with me reading for a second, it said, the Fraud Act is clearly within the class of remedial statutes, which are designed to grant remedies for the protection of rights, introduce regulation conducive to the public good, or cure public evils. And the Supreme Court case, the court said, the penalty is but one part of the regulatory scheme intended as a supplemental aid to enforcement rather than as a punitive measure. What was the amount there, and what was it dealing with? It was the Fraud Act, and I do not know the amount. I can't tell you that. The reservation of rights in this case was inadequate. When you get to looking at the reservation of rights, granted it was long, it does not explain, it did not explain to the insured how their interests interacted, how there was a diametrically opposed outcome, depending upon what type of conduct was proven. It was simply an inadequate reservation of rights. But we don't, you know, so we assert that. We think that because of that, then they're stopped to assert any policy offenses. But we vigorously completely disagree with the central point of his argument, which is that you have to have a complete abandonment of the insured before the insured has any right to conduct the settlement here. When we go back to MIOTA, I said at the outset that it is controlling. I still believe it is. Justice Cook, writing for an American family, Justice Steinman on the panel, also said that the decision to settle belongs to the insured. So the notion that if you have to defend, even when you have a reservation of rights, that the insured has no rights is simply not true. Lastly, I think it's important to note that they still haven't told you what the insured should have done differently, what the insured could have done differently in the practical world. And they haven't told you why this case, why it was a case of no liability, how it could have been defended for lesser money, how it could have been settled for lesser money. They simply say, well, it was settled and we don't have to pay. And they have not told you, it's very important, they have not told you that they didn't know about every stage of the settlement proceedings. What they said was they weren't a party. And what they want to say is that the appointed counsel was not their lawyer. But the law in Illinois is that even if the appointed counsel, who by the time of the settlement had been discharged but still coming, and we're not critical of him, but discharged but still coming, but he has two clients even in a non-controversial case. The appointed counsel has the tort fees or the defendant as a client. He also has the insurer as a client. And it is presumed that he would notify both of them, including the insurer of everything. And Standard Mutual was careful to say that while we weren't a party and the notice wasn't served on us, they had not told you that they did not have full awareness of what was going on in the settlement. And the record is clear that at no time in the federal district court did they attempt to intervene, to object to the settlement, to do anything. They simply sat back and left the insurer to try to do what the insurer could do, and then they stand here and say, well, they settled without our permission and we shouldn't have to pay. So thank you very much. Okay. Thank you, counsel. Thank you for your advice. We'll be in recess until this afternoon.